IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LINDA C. BYRD-HEDGEPETH,

       **Plaintiff,**

v.                                        **Civil Action No. 3:19cv05**

CAPITAL ONE SERVICES, LLC,

       **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Capital One Services, LLC's ("Capital One") Motion for Summary Judgment. (ECF No. 36.) Plaintiff Linda C. Byrd-Hedgepeth ("Hedgepeth") responded, (ECF No. 51), and Capital One replied, (ECF No. 52). Accordingly, the matter is ripe for disposition.

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[1] For the reasons that follow, the Court will grant Capital One's Motion for Summary Judgment.

## I. Factual and Procedural Background

This employment discrimination matter arises out of Hedgepeth's claims of race and age discrimination against her current employer, Capital One. Before progressing to the factual and

---

[1] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Amended Complaint alleges violations of three federal statutes: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2–2000e-17 ("Title VII"); (2) 42 U.S.C. § 1981; and, (3) the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 ("ADEA").

procedural background of this matter, the Court must first address Hedgepeth's Counsel's submission in response to the Motion for Summary Judgment because it does not comply with the Federal Rules of Civil Procedure and the Local Rules for the Eastern District of Virginia ("Local Rules").

## A.    Counsel for Plaintiff and Lack of Compliance with the Federal Rules of Civil Procedure and the Local Rules

Because the Court finds that Counsel for Plaintiff has not complied with either the Federal Rules of Civil Procedure or the Local Rules—nor this Court's previous rulings—the Court will strike a number of Plaintiff's exhibits.

Previously, on January 9, 2020, this Court granted Capital One's Motion to Strike Hedgepeth's first response brief and exhibits, finding that Counsel for Plaintiff failed to abide by the Local Rules, despite the Court previously granting him an extension of time in which to file. (Jan. 9, 2020 Order 3, ECF No. 50.) Specifically, the Court determined that Counsel for Plaintiff had failed to abide by the applicable page limit and submitted an unsigned affidavit to the Court, which he later withdrew in subsequent filings. (*See id.* 3–4.) Although the Court granted Capital One's Motion to Strike, the Court granted Counsel for Plaintiff an opportunity to file a revised response, but warned that "[s]hould . . . Hedgepeth fail to abide by every requirement in the Local Rules, the Federal Rules of Civil Procedure, and this Order, the Court will not consider any documents presented in opposition to Capital One's Motion." (*Id.* 4.)

Federal Rule of Civil Procedure 56 requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A). Similarly, Local Civil Rule 56 for the Eastern District of Virginia requires that a brief in response to a motion for summary judgment "include a specifically captioned section listing all material facts as to which it is contended that there exists

2

a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B). "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Smith v. U.S. Cong.*, No. 3:12cv45, 2015 WL 1011545, at *3 (E.D. Va. Mar. 6, 2015) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). Where a party has failed

> to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

In filing the current response, Counsel for Plaintiff has not abided by Federal Rule of Civil Procedure 56, Local Rule 56(B), or this Court's January 9, 2020 Order for three reasons. First, while Counsel for Plaintiff has submitted fifty-six (56) exhibits, he relies on only forty (40) exhibits in the Response to the Motion for Summary Judgment (the "Response"). Second, Counsel for Plaintiff disputes many of Capitol One's facts without citing to the record or by citing to immaterial parts of the record. Counsel therefore has not supported a number of his assertions by "citing to particular parts of [the] materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A). Third, Counsel for Plaintiff improperly disputes facts by citing solely to exhibits with no explanation or indication as to how those exhibits "support the facts alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B). For example, Counsel for Plaintiff disputes Capital One's Fact #36 by stating "*see Ex. RR, Ex. QQ, also see Ex. PP.*" (*See* Mem. Resp. Mot. Summ. J. 15, ECF No. 51.)

3

Most concerningly, Counsel for Plaintiff mischaracterizes a number of exhibits. For instance, in disputing Capital One's Fact #37, Counsel for Plaintiff states that "Defendant Palmer acknowledges on several instances that he spoke with the Plaintiff regarding her concerns with Mark Prokop" and cites to portions of Hedgepeth's Declaration. (*Id.*) But Hedgepeth's Declaration contains no such acknowledgement on the part of Palmer—who is *not* a defendant in this matter—but merely *an allegation* by Hedgepeth that Palmer had discussed the matter with Hedgepeth. (*See* Mem. Resp. Mot. Summ. J. Ex. L "Declaration of Linda Byrd-Hedgepeth" ¶¶ 17–20, ECF No. 51-12.)

Given Counsel for Plaintiff's repeated violations of the Federal and Local Rules and this Court's previous warnings, the Court will not consider the exhibits that Hedgepeth submitted but did not cite in her dispute of material facts section.[2] These exhibits violate Federal Rule 56(c)(1)(a). Additionally, where Hedgepeth has merely cited to an exhibit without specifying which portions of that exhibit "support the facts alleged to be in dispute," E.D. Va. Loc. Civ. R. 56(B), the Court will view those facts as undisputed. Although the Court has identified a number of other issues with Counsel for Plaintiff's exhibits and statement of undisputed facts, particularly regarding Hedgepeth's Declaration, the Court will address those deficiencies in the context of the factual background and analysis below.

The Court turns now to the factual background of the case at bar.

---

[2] These exhibits include: ECF No. 51-11 (Ex. K), ECF No. 51-13 (Ex. M), ECF No. 51-17 (Ex. Q), Ex. No. 51-21 (Ex. U), Ex. No. 51-22 (Ex. V), Ex. No. 51-23 (Ex. W), ECF No. 51-24 (Ex. X), ECF No. 51-31 (Ex. EE), ECF No. 51-32 (Ex. FF), ECF No. 51-33 (Ex. GG), ECF No. 51-34 (Ex. HH), ECF No. 51-35 (Ex. II), ECF No. 51-37 (Ex. KK), ECF No. 51-38 (Ex. LL), ECF No. 51-40 (Ex. NN), ECF No. 51-43 (Ex. QQ), ECF No. 51-46 (Ex. TT), ECF No. 51-57 (Ex. EEE), ECF No. 51-58 (Ex. FFF).

## B.    Factual Background[3]

Hedgepeth, an African American woman, has worked at Capital One since 2009.  (Am. Compl. ¶¶ 5, 8, ECF No. 21; Mem. Supp. Mot. Summ. J. Ex. 7 "Linda Byrd-Hedgepeth Employee Profile," ECF No. 37-7.)  Capital One "offers a broad spectrum of financial products and services to consumers, small businesses and commercial clients."  (Mem. Supp. Mot. Summ. J. Ex. 1 "Job Profile:  Senior Quality Assurance Coordinator" 1, ECF No. 37-1.[4])  In 2011, Capital One promoted Hedgepeth to the position of "Senior Quality Assurance Coordinator," often referred to as a Senior Coordinator in the "Quality Management Operations ('QMO') team in Richmond, Virginia."  (Am. Compl. ¶ 9; Hedgepeth Employee Profile.)  Hedgepeth was 53 years old when Capital One first hired her, 55 years old when she received the above promotion, and 63 years old when she filed her Amended Complaint in July 2019.  (Mem. Supp. Mot. Summ. J. Ex. 8 "Deposition of Linda Byrd-Hedgepeth" 2, ECF No. 37-8; Am. Compl. ¶¶ 9, 72.)

Hedgepeth continues to work at Capitol One as a Senior Coordinator.  (Am Compl. ¶¶ 9, 47; Hedgepeth Emp. Profile; Mem. Supp. Mot. Summ. J. Ex. 9 "Manager History" 1, ECF No. 37-9.)  Capital One's provided job description for a Senior Coordinator states that the position's responsibilities include:

> Conduct production sampling, and other quality assurance testing measurements that provide information critical to assessing process execution and customer experience - Perform data entry and data research activities - Respond to questions and requests from management and key stakeholders - Execute and provide recommendations for process improvements and/or operating procedures -

---

[3] In recounting the factual history, the Court relates the undisputed facts as articulated in the Complaint and the Parties' briefing on both motions for summary judgment.  In ruling on each motion, the Court will view the undisputed facts and all reasonable inferences therefrom in the light most favorable to Hedgepeth, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In this section, however, the Court merely sets forth the undisputed facts.

[4] The indicated page number of each exhibit references the page number as assigned by the Court's CM/ECF System.

Calibrate performance standards with peers and dedicated line of business - Document procedures in accordance with established policies - Generate and distributing updates and reports as needed[.]

(Job Profile:  Senior Quality Assurance Coordinator 1.)

From April 2016 to July 2017, with the exception of a two month long special project, Hedgepeth reported to Unit Manager Mark Prokop.  (Hedgepeth Dep. 33–34; Manager History 1.)  Since then, Hedgepeth has reported to several other supervisors, including Shameka Washington, Shelby Blackmore, Tinikia Coleman, and Brian Palmer.  (Manager History 1.)

## 1.    The QMO Department

As a Senior Coordinator, Hedgepeth works in the QMO Department.  (Am. Compl. ¶ 9.) The QMO Department monitors for regulatory compliance and business intent errors.  (Mem. Supp. Mot. Summ. J. Ex. 10 "Deposition of Brian Owen Palmer" 2, ECF No. 37-10.[5])  The QMO Department is also "tasked with ensuring that . . . business policies [are] current and up to date" and that "agents [are] not violating those [sic] business intent."  (Hedgepeth Dep. 3–4.)

As to regulatory compliance, Senior Coordinators, such as Hedgepeth, "monitor[] calls and cases of front line managers to validate regulatory compliance."  (Am. Compl. ¶ 9; *see also*

---

[5] The record reflects that Palmer gave two depositions: one in his personal capacity as a fact witness, (Mem. Supp. Mot. Summ. J. Ex. 10 "Deposition of Brian Owen Palmer," ECF No. 37-10), and one as a representative of Capital One pursuant to Federal Rule of Civil Procedure 30(b)(6), (Mem. Supp. Mot. Summ. J. Ex. 13 "30(b)(6) Deposition of Brian Owen Palmer," ECF No. 36-13).  Under Federal Rule of Civil Procedure 30(b)(6)

> a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination.  The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify . . . .  The persons designated must testify about information known or reasonably available to the organization

Fed. R. Civ. P. 30(b)(6).

Palmer Dep. 2.)  Senior Coordinators use a Compliance Manual, developed by the Compliance Department, to identify "potential regulatory error[s]."  (Hedgepeth Dep. 6.)

As to business intent errors, Senior Coordinators use a "CRWEB" document that functions as a "business policy on particular tasks," and identifies steps that "must be done . . . like a task document that states if an agent takes a payment, they must do this and that."  (*Id.* 7.)  A department other than QMO produces the CRWEB.  (*Id.* 8.)  Senior Coordinators in QMO then use that document to "make sure that [Capital One agents] have followed the steps, and [Capital One] has not created some risk to the customer."  (*Id.*)

### 2.    Initial Workplace Disagreements with Mark Prokop

The workplace conduct relevant to the case at bar began in 2016.  On October 27, 2016, Hedgepeth sent an email to Mark Prokop, Sean Reid, and a number of other Capital One employees concerning a payment error.  (Mem. Supp. Mot. Summ. J. Ex. 14 "Prokop Hedgepeth October 27–28, 2016, Email Chain" 7, ECF No. 37-14.)  The email chain shows that Reid forwarded the email to another Capital One employee, and eventually a different Capital One employee, who "coached" the agent who had made the error.  (*Id.* 5–6.)

The next morning, on October 28, 2016, Prokop, Hedgepeth's manager at the time, sent an email to Hedgepeth asking whether "Reid ask[ed] to be copied on payment related items? I'm curious what drove us to take this path?"  (*Id.* 4.)  Prokop explained that he was "concerned that it took an eventual path to our customer and could possibly be perceived as us telling on them rather than working with them.  Thoughts?"  (*Id.*)

Hedgepeth responded that she copied Reid on her original email because the matter was "in his queue" and that she was "not sure what you mean by telling on them as opposed to sharing information about a tool that agents are directed to use."  (*Id.*)  She finished that "if you

7

do not think we should send the BI Errors to the business just let me know.  Thought this was a special assist project and not sure how long it will last, but rely on your direction." (*Id.*) Hedgepeth further stated in a later email that same day that: "[w]e have not been requested to send BI Errors out for any [line of business] but I thought it was beneficial . . . . **[t]his is a critical issue for the LOB because it can and has resulted in requests for fee waivers because of the miscommunication.**" (*Id.* 2 (bold in original).)

In several emails sent that day to Hedgepeth, Prokop again expressed his concern about the "path" the communication took and expressed his desire for "US to work together on all of these concerns regarding both PCO and payments and form a group thought before going to the business." (*Id.* 1, 3.)

### 3.    Hedgepeth's 2016 End of the Year Review

At the end of every calendar year, managers at Capital One rate Senior Coordinators in one of the following categories:  Action Required, Inconsistent, Strong, Very Strong, or Exceptional.  (Palmer Dep. 4.)  Managers work together in "cross-calibration sessions . . . to discuss associates at each job level and . . . discuss[] . . . performance compared to that of their peers."  (Mem. Supp. Mot. Summ. J. Ex. 15 "30(b)(6) Deposition of Kesha Hinson" 2–3, ECF No. 37-15.[6])

In 2016, Hedgepeth received a rating of "Strong" in her End of Year Review (the "2016 Review").  (Hedgepeth Dep. 35; Mem. Resp. Mot. Summ. J. Ex. P "June 27, 2017 Management Conversation Notes," ECF No. 51-16).  From 2013 to 2015, Hedgepeth had received annual ratings of:  (1) "Very Strong;" (2) "Strong;" and, (3) "Very Strong" respectively.  (June 27, 2017

---

[6] The record reflects that Hinson took two depositions on the same day:  one in her personal capacity as a fact witness, (Ex. 4), and one as a representative of Capital One pursuant to Federal Rule of Civil Procedure 30(b)(6), (Ex. 15).

Management Conversation Notes.)  On February 28, 2017, Hedgepeth contacted Prokop and

expressed detailed concerns about his written feedback in her 2016 Review.  (Mem. Resp. Mot.

Summ. J. Ex. AA "February 28, 2017 Email Chain" 2–7, ECF No. 51-27.)

Hedgepeth began her email to Prokop by "respectfully request[ing] the

'OPPORTUNITIES' listed below should be removed because they were not a part of our

discussion and were not made known to me at any point in 2016."[7]  (*Id.* 2.)  Hedgepeth also

objected to several comments made by Prokop in her 2016 Review, including Prokop's

observation that "while [Hedgepeth's] keen eye for detail is often an assist, she herself has stated

she has a hard time letting go of some situations and struggles to remove emotion from

Regulatory Business Intent expectations."  (*Id.* 2–3.)  In response, Hedgepeth stated to Prokop:

> you've applauded me for raising issues that most will not, but when you state that
> I have a problem separating myself from emotions *implies that my requests for
> additional clarification is driven because I am a woman that cannot accept rulings
> different than my positions.*

(*Id.* 3 (emphasis added).)  Hedgepeth also requested Prokop remove his comment that Hedgepeth

had one of the lowest call reviewing speeds of her colleagues ("one of the lowest CPH rates

across QMO") as it was not "discussed during [her] Year End Appraisal meeting."  (*Id.* 2–3.)

---

[7] The section identified by Hedgepeth stated that:

Opportunities - Influence - Although [Hedgepeth] produces the majority of process
improvement suggestions within my team, the implementation success rate by the
business is not as high as she would like and has stated that the business often does
not make changes based on her suggestions.  With that being said, Linda was a
driver behind a large find this year (Cash Advance APR) and has therefore shown
the ability to move important items forward.  The learning is better focusing needs
on true need areas and better focusing communications to the LOB to help gain
buy-in.

(February 28, 2017 Email Chain 2.)  In response, Hedgepeth stated that "[w]e continue to have
serious overlapping policy issues that the business is unable to address single-handedly . . . .
[l]isting this as an 'Opportunity' for me reduces this to an Associate level and holds me primarily
responsible for an organizational change and not Capital One."  (*Id.* 3.)

Although Hedgepeth's February 28, 2017 email spans nearly five pages, she did not mention that she believed that Prokop made any of those comments on account of her race or age. (*See id.*)

Senior Manager Jeff Nelson, Mark Prokop's supervisor, responded to Hedgepeth's email, stating that because Hedgepeth was "disagreeing with parts of [her] appraisal, I am getting involved." (*Id.* 1.) Nelson raised Hedgepeth's concerns, expressed in the February 28, 2017 email, with Associate Relations ("AR"). (Mem. Supp. Mot. Summ. J. Ex. 17 "Salesforce Case 20170302-1002076" 6, ECF No. 37-17.)[8]

Lisa Barrett, an AR Representative, managed Hedgepeth's complaint about her 2016 Review. (*Id.*) On March 7, 2017, Barrett met with Jeff Nelson. (*Id.*) According to Barrett's notes from the meeting, she stated that Nelson and Hedgepeth had met to discuss Hedgepeth's concerns about her 2016 Review and that

> Jeff told Lynda that her comment to Mark about a comment was driven because she
> is a woman is serious. Lynda said she didn't mean it and moved on in the discussion
> from that to discuss her results. Jeff said that Lynda is incrediability [sic] high
> performing as far as results, but struggles with relationship building,
> communication, judgment, which took her from Very Strong to Strong. Lynda's
> request was that Mark go back and change her review because she disagreed with
> pieces in it. Jeff does not feel changes to the review are justified.

(*Id.*) Nelson told Barrett that he had met with Prokop and that he had "been providing [Prokop] with communication feedback." (*Id.*)

Approximately one week later, on March 13, 2017, Barrett met with Hedgepeth to discuss her concerns, which focused primarily on Prokop's comment about Hedgepeth struggling to remove "emotion" from her work. (*Id.* 5.) According to Barrett, Hedgepeth stated "that her

---

[8] Capital One and Hedgepeth submit several "Salesforce Case" entries in support of their briefs. From context, these Salesforce entries are used by Associate Relations or Human Resources ("HR") at Capital One to track the details of complaints or investigations. Often, the AR or HR representative will enter entire emails into the Salesforce document or summarize their interviews with various actors.

difficulty is trying to understand why this [disagreement with Prokop] was escalated to AR." (*Id.*)  Barrett continued that: "[a]ll she wanted was that statement about her holding on to things emotionally to be removed and for Mark to explain to her why he wrote that." (*Id.*)

Roughly three weeks later, on April 4, 2017, Sara Hidalgo—Nelson's supervisor—and Nelson met with Hedgepeth. (*See* Mem. Supp. Mot. Summ. J. Ex. 19 "Hidalgo Hedgepeth April 2, 2017 Email Chain" 2, ECF No. 37-19.)  Hidalgo stated that "Jeff will work with you on an immediate change to your work assignment" and that she was "working with AR to make the changes to your review" including requesting "that the 2015 info be removed and that they delete some of the verbiage in the two sections from 2016 that we discussed." (*Id.*)  Hedgepeth responded by asking for clarification and inquiring as to whether her rating would "be changed on my Annual Appraisal." (*Id.*)  Hidalgo responded that she was "not pursuing changing [Hedgepeth's] rating, the rating is vetted across leadership and is not only based on your written review but your performance relative to other Sr. Coordinators." (*Id.* 1.)  That same day, Hidalgo emailed Nelson instructing him to remove large portions of text from Hedgepeth's 2016 Review, including the language about Hedgepeth struggling to remove "emotion" from her decisions. (Mem. Supp. Mot. Summ. J. Ex. 20 "Hidalgo Nelson April 4, 2017 Email," ECF No. 37-20; Mem. Supp. Mot. Summ. J. Ex. 6 "Deposition of Jeffrey Nelson" 3–4, ECF No. 37-6.)

During the investigation into the 2016 Review, Hedgepeth asked to be removed from Prokop's team. (*See* Hedgepeth Dep. 33.)  Capital One complied and assigned Hedgepeth to "a special project with Shameka Washington." (*Id.* 33–34.)  Between April 2017 and July 2017, Hedgepeth worked on the special project under Washington and did not report to Prokop. (*Id.* 34.)  Hedgepeth did not return to Prokop's team after completion of the special project in July 2017. (*Id.*)

11

On June 22, 2017, Nelson sent an email to Hidalgo and Laura Henry, an HR consultant, indicating that Hedgepeth could not access the modified version of her 2016 Review. (Mem. Supp. Mot. Summ. J. Ex. 21 "June 22, 2017 Email Chain" 1, ECF No. 37-21.) In a separate communication, Nelson tells a Capital One employee that he could view Hedgepeth's revised 2016 Review, even if she could not, stating that: "I looked over [Hedgepeth's] shoulder and indeed, for some reason, she can no longer see her 2016 [Review] in Workday (even though I can). I . . . emailed her a PDF version to reference in the meantime." (Mem. Supp. Mot. Summ. J. Ex. 22 "Salesforce Case 20170428-1039550" 7, ECF No. 37-22.) Henry responded four days later, indicating that "[i]t is fixed in the system so she should be able to send it now." (June 22, 2017 Email Chain 1.) Nelson responded indicating that he would have Hedgepeth "try it when she returns to the office (tomorrow)" and thanking Henry for the help. (*Id.*)

### 4.   Internal Disparate Treatment Complaint Against Mark Prokop

In late April 2017, during the investigation of her 2016 Review, Hedgepeth sent an email to Kesha Hinson, an AR representative, alleging "disparate treatment, disparate impact" against Mark Prokop. (Mem. Supp. Mot. Summ. J. Ex. 4 "Deposition of Kesha Hinson," 3, ECF No. 37-4; Salesforce Case 20170428-1039550, at 9.) On April 28, 2017, Hinson, coordinating with Nelson, launched an investigation into these allegations, and interviewed "all of the associates on Mr. Propkop's team." (Hinson Dep. 4.) Although Hinson stated that she interviewed all the associates on Prokop's team, (*see id.*), her internal notes indicate that she may not have interviewed Schniece Lambert and Janice Rorie, two African American women and members of Prokop's team. (Salesforce Case 20170428-1039550, at 4, 8.) Hinson noted under a recommendation to interview both Lambert and Rorie that "Schniece went out on leave" and "Janice didn't engage in the investigatory process." (*Id.* 4.)

According to Hinson's notes, Hedgepeth initially contacted Hinson to "share her observations of [Prokop's] behavior." (*Id.* 9.) According to Hinson, Hedgepeth stated that "at least 99% of the African American people under Mark don't feel like they've been treated fairly regarding opportunities and how they are talked to." (*Id.*) In support of her observation of disparate treatment, Hedgepeth shared that recently a "Principal Coordinator, Robert Burreson was yelling at [her] on the floor, she sent an email to . . . Prokop but [he] didn't respond so [Hedgepeth] had to escalate to Sr. management. Linda stated there was an issue last year similar in nature and it appears to be a pattern for Mark." (*Id.* 10.) Hedgepeth recounted that a different colleague, Laura Jane, had also "yelled at her and the issue [was not] resolved."[9] (*Id.*) According to Hinson's entries, Hedgepeth "shared that she felt there serious behavioral issues with [Prokop] and that [Hedgepeth] felt threatened." (*Id.*) In an email from Hedgepeth to Hinson, Hedgepeth recommended Hinson interview several of her African American colleagues, including Schniece Lambert and Janice Rorie, who she alleged outperformed many of her Caucasian colleagues. (*Id.* 8.)

On May 11, 2017, Hedgepeth sent another email to Hinson. (Mem. Resp. Mot. Summ. J. Ex. R. "Hedgepeth Hinson May 11, 2017 Email," ECF No. 51-18.) Hedgepeth documented a number of ongoing concerns, including previous complaints about her 2016 Review and her increased workload compared to that of her Caucasian colleagues. (*Id.*) Hedgepeth also expressed frustration that her complaints were "directed back to the Senior Manager who has failed to rectify previous situations." (*Id.*)

---

[9] As to the incident with Laura Jane, Nelson had investigated the incident, which occurred on May 31, 2016, and stated in an email to Hedgepeth that Laura Jane had "admitted that her response could have been better" but indicated that a "discussion between you and [Laura Jane] is needed to agree on a path forward." (Mem. Resp. Mot. Summ. J. Ex. C "Hedgepeth Nelson June 17, 2016 Email" 1, ECF No. 51-3.)

Approximately six weeks later, in late June 2017, Nelson sent an email to Hinson recounting a recent conversation with Hedgepeth. (Salesforce Case 20170428-1039550, at 7.) According to Nelson, Hedgepeth had expressed concern: with her 2016 Review; with management's handling of her dispute with Robert Burreson; and, that she would be forced to return to Prokop's team after her special project had finished. (*Id.*) Hedgepeth sent an email to Hinson documenting some of these concerns, including that she had not been informed she "would go back to the same team" after completing her current project. (*Id.*)

In September 2017, Hinson entered her final case summary regarding her investigation into Hedgepeth's allegations. (*Id.* 3.) As to the allegations against Prokop, Hinson wrote that "[a]lthough the allegations [of disparate treatment and disparate impact] were unsubstantiated, symptoms of poor management on [Prokop's] part were confirmed. (Salesforce Case 20170428-1039550, at 3.) Hinson determined that the perception of Prokop—as related by two unnamed African American team members—was "that he treats associates unfairly." (*Id.*) Hinson noted that two African American associates "have been moved from [Prokop's] team" and recommended that Prokop modify his management behavior and attend various trainings. (*Id.*) Hinson did not recommend termination of Prokop, noting that "[t]he primary conflict appears to be related to concerns from Janice Rorie and [Hedgepeth] versus coming from other current team members and/or being substantiated by other current team members." (*Id.*)

Addressing Hedgepeth's concerns about returning to Prokop's team, Hinson related that "HR Consultant Laura Henry and Director Sara Hidalgo met . . . to discuss potential options for [Hedgepeth] and landed on moving [her] to another team." (*Id.*) Around that time, Capital One

14

assigned Hedgepeth to a different team under the management of Shelby Blackmore. (*See* Hedgepeth Dep. 34.)

On September 5, 2017, Hinson closed the investigation. (Salesforce Case 20170428-1039550, at 10.)

### 5.   Hedgepeth's Application for the Process Coordinator Position

While Capitol One investigated Hedgepeth's complaints about her 2016 Review and disparate treatment, she applied for the position of Process Coordinator on May 18, 2017. (Am. Compl. ¶ 9.) Brian Palmer, a manager who did not supervise Hedgepeth, acted as the hiring manager for the position. (Palmer Dep. 7.) Forty-seven (47) Capital One employees applied for the position, and management selected nine applicants, including Hedgepeth, for an interview. (Mem. Supp. Mot. Summ. J. Ex. 24 "June 6, 2017 Email Regarding Process Coordinator," ECF No. 37-24.) At that time, Hedgepeth had five years and ten months of experience in her role as a Senior Coordinator. (*Id.*)

On June 13, 2017, a manager at Capital One, Breeze Fennel, interviewed Hedgepeth for the Process Coordinator position and prepared an interview report.[10] (Mem. Supp. Mot. Summ. J. Ex. 25, "Hedgepeth Interview Report" 1, ECF No. 37-25.) Fennel marked Hedgepeth's file as "Do Not Recommend." (*Id.*) Fennel rated Hedgepeth in three categories: "Additional Questions;" "Interests and Motivations;" and, "Past Work Experiences/Job Specific Skills." (*Id.*)

---

[10] Hedgepeth avers that "I know unequivocally that Breeze Fennell did not interview me for any position and this was another example to remove the pressure from Palmer (Caucasian male) to deny me the position because of the influence of his Senior Manager (Jeff Nelson) and Sara Hidalgo, Director of Operations, (all Caucasians)." (Hedgepeth Decl. 4.) Hedgepeth states that she interviewed for the position on June 13, 2017 with Matt Saunders. (Hedgepeth Dep. 28.) Despite this, Hedgepeth states that "the information [in the interview report] is similar to what kind of conversation I had with [Saunders] when interviewing for the position." (*Id.*) She further agreed that the information in her Interview Report seemed "correct" and accurately reflected her conversation with Saunders. (*Id.*)

Fennel rated Hedgepeth "Medium" in "Interests and Motivations" and "Low" in the other two categories. (*Id.*) In the summary notes, Fennel indicated that

> [Hedgepeth] does seem to be very detail-oriented, but during the conversation, seemed to lack an understanding of expectations of the role. Examples of strengths she would bring to the role were vague and focused on contributions of an individual contributor and not that of a team.

(*Id.*) Fennel also stated that "[c]andidates explanations of interest in role and strengths to bring to role were unclear." (*Id.*) Informing this statement, during the interview, Hedgepeth stated her focus would be on "root cause analysis." (*Id.* 5.) Fennel observed that "Linda spoke a great deal of performing root cause analysis and bringing that to the role as an individual contributor, but no examples of what skills should [sic] would bring to help the team succeed as a whole." (*Id.*)

On June 13, 2017, the same day as Hedgepeth's interview with Breeze Fennel, Palmer interviewed Khola Albadani, age 30, for the Process Coordinator position. Following her interview, Palmer gave Albadani a score of "Strong Recommend" for the position. (Albadani Interview Report 1; Mem. Supp. Mot. Summ. J. Ex. 27 "Albadani Interview Report," ECF No. 37-25.) Palmer believed Albadani to be of "Yemen[ese] . . . [or] Middle Eastern" ethnicity. (Palmer. Dep. 7.) Like Hedgepeth, Albadani had worked at Capital One since 2009. (Mem. Supp. Mot. Summ. J. Ex. 26 "Khola Albadani Resume," ECF No. 37-26.) Albadani had four years and two months of experience in her role as a Senior Coordinator, as compared to Hedgepeth's five-plus years. (June 6, 2017 Email Regarding Process Coordinator.)

Palmer rated Albadani "Medium" in the "Additional Questions" and "Interests and Motivations" categories, and "High" in "Past Work Experiences/Job Specific Skills." (Albadani Interview Report 1.) In support of his recommendation, Palmer stated that Albadani had already "done the work of a PC [Process Coordinator] in many situations through her time in QMO" and "[f]eels like she has the drive and enthusiasm to learn and take on the challenge. Previous skills

demonstrated she is able to get in and work in the team." (*Id.*) Palmer also noted that Albadani possessed experience in training roles, had gone to "India to train Chat folks," and after "5 years in chat and QMO" was "[r]eady to expand the knowledge and learn something new." (*Id.* 2–3.)

In a later summary of his interview with Albadani, Palmer stated that Albadani's answer to the question of why she was interested in the position

> was exceptional. She was very much able to describe to us exactly why she wanted to move on, and what was changing about her interest and her goals, and she was very much in alignment with what we were looking for in the role.

(Mem. Supp. Mot. Summ. J. Ex. 13 "30(b)(6) Deposition of Brian Owen Palmer" 8, ECF No. 36-13.) Palmer, as the hiring manger, promoted Albadani to the Process Coordinator role. (*Id.* 11.) Palmer stated that he had no knowledge of Hedgepeth's internal complaint of discrimination while he was the hiring manager for the Process Coordinator position. (*Id.* 4.)

### 6. Hedgepeth's Application for the Human Resources Associate Relations Consultant Position

On or about June 1, 2017, two weeks before she interviewed for the Process Coordinator position, Hedgepeth applied for an Associate Relations Consultant position, a role posted by HR Specialist, Nikki Lockhart. (Am. Compl. ¶ 14; Mem. Supp. Mot. Summ. J. Ex. 29 "Lockhart Email Chain," ECF No. 37-29.) Four-hundred and fifty-four (454) candidates applied for the position, (30(b)(6) Palmer Dep. 9–10), which was posted at the "Associate" level, (Mem. Supp. Mot. Summ. J. Ex. 28 "Associate Relations Consultant Job Description," ECF No. 37-28). Capital One's entry level positions begin at "Coordinator" and progress in seniority as follows: Coordinator, Senior Coordinator, Principal Coordinator, Associate. (*See* 30(b)(6) Palmer Dep. 9–10.) Capital One therefore posted the Associate Relations Consultant role two levels above Hedgepeth's then-level of Senior Coordinator. (*Id.*)

Five days before Hedgepeth applied for the Associate Relations Consultant position, on May 26, 2017, Lockhart instructed a Capital One recruiter that the hiring team was "looking for a high performing *Principal Associate* (ready for promotion) or an *Associate* for the role . . . we are not able to consider coordinator and senior coordinator level associates at this time." (Lockhart Email Chain (emphasis added).)  Because Hedgepeth, as a Senior Coordinator, was more than one level down from Associate, she did not meet Lockhart's prescribed hiring criteria for the position.  (30(b)(6) Hinson Dep. 7.)  She was not granted an interview.  (*Id.*; Am. Compl. ¶ 14.)

Capital One ultimately hired Laura Berry (age 31, Caucasian) for the position.  (Mem. Supp. Mot. Summ. J. Ex. 30 "Laura Berry Resume," ECF No. 37-30.)  At the time of her application, Berry worked as a "Recruiter" at the "Associate" level for Capital One.  (*Id.*)  Berry had seven years of human resources experience.  (*Id.*)

During his Rule 30(b)(6) Deposition, Palmer stated that although Capital One allows "folks to apply for a[n] [open] position" they may "filter candidates" when facing a large applicant pool.  (30(b)(6) Palmer Dep. 9.)  In this case, Palmer suggests that Capital One needed a way to "reduce the number [of applicants] from 454" and thus filtered applicants by "look[ing] at folks who [are] already in a position . . . at that level . . . or somebody who is one level below, which you would put into what's called a promotable role."  (*Id.*)

During the Equal Employment Opportunity Commission's ("EEOC") investigation of Hedgepeth's Charge of Discrimination, Hedgepeth stated in regard to the Associate Relations Consultant role that: "[w]ith regard to the promotion for HR Associate, although I felt I was qualified for the position, the person who was selected I felt was better qualified and therefore I

am not contesting not receiving this promotion." (Mem. Supp. Mot. Summ. J. Ex. 31 "Hedgepeth EEOC Response," ECF No. 37-31.)

## 7.    Additional Allegations of Discrimination and Disparate Treatment

In addition to the events documented above, Hedgepeth asserts that Capital One discriminated against her in several other ways.

First, Hedgepeth alleges that on or about April 30, 2018, Brian Palmer and Tinikia Coleman engaged "in a pattern and practice of disparate treatment towards [Hedgepeth by] giving [her] conflicting and confusing work requirements[.]" (Am. Compl. ¶ 17; Mem. Resp. Mot. Summ. J. 23.) For example, on April 30, 2018, Hedgepeth sent an email to Tinikia Coleman, Hedgepeth's then-manager, regarding the number of "[Fraud and Dispute] Elite and no Call-Back/AHT" monitors Coleman expected Hedgepeth to complete for the month of May 2018. (Mem. Supp. Mot. Summ. J. Ex. 34 "Hedgepeth Coleman April Email Chain" 1, ECF No. 37-34.) Hedgepeth stated that she thought Coleman asked her to do sixty monitors "in [the] meeting today" but a document from "Palmer's team" indicated she should complete onehundred (100) such monitors during the month of May. (*Id.*) Coleman sent an email in response, stating: "[g]reat catch! I had confirmed 60 with Brian, but for whatever reason was still typing 100 lol. Its right in our true forecasting but missed it here . . . . [s]orry for the confusion." (*Id.* 2.)

More than two weeks later, on May 16, 2018, Hedgepeth sent another email to Coleman, expressing concerns that "Palmer's Team have me projected at '100' and not '60' that is why I raised the issue." (Mem. Supp. Mot. Summ. J. Ex. 34 "Hedgepeth Coleman May Email Chain" 1, ECF No. 37-34.) Hedgepeth stated that "I have never indicated that I would be unable to complete 60 monitors for the month, just wanted to get consistency in what the expectations were since the numbers are not the same." (*Id.*) Later that day, Coleman responded "[d]efinitely

on the same page with you on this!  I think we've got the confusion cleared up, and it should also

be reflective on the board now about the true projection of monitors you are to do this month."

(*Id.* 2.)  Coleman apologized "for any confusion or frustration" and emphasized that she

appreciated Hedgepeth's "hard work and all of the value you are bringing."  (*Id.*)

On May 22, 2018, Coleman contacted AR for assistance in "build[ing] a connection"

with Hedgepeth and discussed the matter with AR representative Hinson.  (Mem. Resp. Mot.

Summ. J. Ex. Z "Coleman Hinson HR Entry" 1, ECF No. 51-26.)  In Hinson's notes of the

meeting, Hinson indicated that

> Tinikia [Coleman] stated that Linda [Hedgepeth] has been assigned new work with
> an expectation of completing 240 monitors per month but Tinikia is only assigning
> Linda 60 monitors a month and Linda is responding that Linda doesn't know if
> Linda can complete 60 monitors a month. - Tinikia stated that recently Linda shared
> a conflict with expectations for another team that Linda supports.  The team is
> telling Linda 100 monitors a month but Tinikia has set the expectation of 60
> monitors a month.  Tinikia stated that Tinikia advised Linda the metrics on the team
> whiteboard would be updated however, Linda continued to question the conflicting
> information pertaining to the monitors. - Tinikia stated that she will continue to
> offer support to Linda and making the effort to establish a meaningful connection.

(*Id.*)

Second, Hedgepeth alleges that while she was on leave in June 2018, Coleman

"submitted a scorecard with lower evaluation scores and made false statements that the

evaluation was shared with Plaintiff Hedgepeth on July 10, 2018."  (Am. Compl. ¶ 19.)

On July 10, 2018, Coleman sent an email to Hedgepeth stating that the June Scorecard was

attached.  (Mem. Resp. Mot. Summ. J. Ex. YY "Coleman Scorecard Email" 1, ECF No. 51-51.)

The attached scorecard (the "June Scorecard") states that Hedgepeth was "out of the office at the

time June reflections were requested."  (*Id.* 2.)  The June Scorecard rated Hedgepeth as "Meeting

Expectations" in all categories, each of which were highlighted green.  (*Id.*)

### C.     **Procedural History**

On January 4, 2019, Hedgepeth, appearing *pro se*, filed her initial Complaint against

Capital One.  (Compl., ECF No. 1.)  On June 6, 2019, Hedgepeth obtained Counsel, (ECF

No. 14), and one month later, on July 8, 2019, she filed her Amended Complaint, (ECF No. 21).

Capital One filed a Motion to Dismiss two counts of the Amended Complaint brought pursuant

to the Virginia Human Rights Act, Va. Code §§ 2.2-3900–3903.  (*See* ECF Nos. 22–23.)

Hedgepeth consented to dismissal of those counts, (ECF No. 31), and the Court dismissed those

two claims with prejudice, (Aug. 23, 2019 Order, ECF No. 32).

On December 11, 2019, Capital One filed its Motion for Summary Judgment.  On

January 3, 2020, Hedgepeth filed her first response in opposition.  Capital One submitted a

Motion to Strike Hedgepeth's first response, (ECF No. 44), which the Court granted, (ECF

No. 49).  On January 13, 2020, Hedgepeth filed her second Response to the Motion for Summary

Judgment.  Capital One replied.

The Amended Complaint brings six claims, as follows:[11]

| | |
|---|---|
| **Count I:** | Capital One subjected Hedgepeth to unlawful disparate treatment by treating her differently from white employees in violation of Title VII (the "Title VII Disparate Treatment Claim"); |
| **Count III:** | Capital One "subjected Hedgepeth to disparate treatment, adverse employment actions and failure to promote" on the basis of her race in violation of 42 U.S.C. § 1981 (the "§ 1981 Disparate Treatment Claim"); |
| **Count IV:** | Capital One retaliated against Hedgepeth for engaging in protected activity when she complained of race discrimination in violation 42 U.S.C. § 1981 (the "§ 1981 Retaliation Claim"); |
| **Count V:** | Capital One retaliated against Hedgepeth for engaging in protected activity when she complained of race discrimination in violation of Title VII (the "Title VII Retaliation Claim"); |

---

[11] As stated above, on August 23, 2019, the Court dismissed Counts II and VI brought pursuant to the Virginia Human Rights Act. (*See* Aug. 23, 2019 Order.)  The Court will maintain the original numbering of the claims in the Amended Complaint for consistency.

**Count VII:** Capital One engaged in age discrimination against Hedgepeth by allowing her age to become a factor in its hiring decisions in violation of the ADEA (the "ADEA Failure to Promote Claim"); and,

**Count VIII:** Capital One retaliated against Hedgepeth for engaging in protected activity when she complained of age discrimination in violation of the ADEA (the "ADEA Retaliation Claim").

(Am. Compl. ¶¶ 37, 48, 55, 61, 74, 78.)

For the reasons stated below, the Court will grant Capital One's Motion for Summary Judgment on all six claims.

## II.  Standard of Review: Rule 56

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Liberty Lobby*, 477 U.S. at 248–50.

"A fact is material if the existence or non-existence thereof could lead a [finder of fact] to different resolutions of the case." *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 628 (E.D. Va. 2016) (citing *Liberty Lobby*, 477 U.S. at 248).  Once a party has properly filed evidence supporting its motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24.  The parties must present these in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Liberty Lobby*, 477 U.S. at 255.  Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia*

22

*Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his [or her] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (*en banc*) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

In the end, the non-moving party must do more than present a scintilla of evidence in its favor.

> Rather, the non-moving party must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant, for an apparent dispute is not genuine within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable [finder of fact] to find the facts in his [or her] favor.

*Sylvia Dev. Corp.*, 48 F.3d at 818 (internal quotations, citations, and alterations omitted). The ultimate inquiry in examining a motion for summary judgment is whether there is "sufficient evidence favoring the nonmoving party for a [finder of fact] to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

### III. Analysis

Viewing the record as a whole and in the light most favorable to Hedgepeth, no dispute of material fact exists that would allow a reasonable juror to conclude that Capital One failed to promote, treated disparately, or retaliated against Hedgepeth on the basis of her race or age. The Court will therefore grant summary judgment to Capital One on all six claims.[12]

---

[12] In Hedgepeth's Response she appears to allege, for the first time, that she experienced a "hostile work environment" at Capital One but she does not elaborate on this claim. (Mem. Resp. Mot. Summ. J. 1, 8–9.) The word "hostile" does not appear anywhere in the Amended Complaint. (*See* Am. Compl.) Because "[a] plaintiff may not amend [his or her] complaint through arguments at the summary judgment stage," *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 435 (D. Md. 2006), the Court will not consider any claim for a hostile work environment here.

23

First, because all of Hedgepeth's claims rely on the existence of an "adverse employment action" or "adverse action," the Court will begin by addressing Hedgepeth's failure to promote claims contained within Counts I, III, and VII: the Title VII Disparate Treatment Claim;[13] the § 1981 Disparate Treatment Claim; and, the ADEA Failure to Promote Claim. The Court determines that Hedgepeth's failure to promote claims—based on race and age—do not survive summary judgment. Because Count VII, fairly read, presents *only* a failure to promote claim, the Court will grant Summary Judgment as to Count VII in its entirety.

After concluding that Hedgepeth's failure to promote claims do not survive Summary Judgment, the Court will then address Hedgepeth's remaining three claims. Ultimately, the Court finds that Hedgepeth does not provide evidence that would allow a reasonable juror to conclude that Capital One took an "adverse employment action" against her, defeating her disparate treatment claims. Similarly, the Court determines that even under the less-stringent standard for retaliation claims, Hedgepeth does not create a dispute of material fact that Capital One took a "materially adverse action" against her.

The Court now turns to Hedgepeth's failure to promote claims, as presented in Counts I, III, and VII.

---

[13] In her Amended Complaint, Hedgepeth states under Count I that "Capital One's racially discriminatory policies, practices and/or procedures have produced a disparate impact against . . . Hedgepeth with respect to the terms and conditions of her employment." (Am. Compl. ¶ 25.) Under Title VII, "[a]n unlawful employment practice based on disparate impact is established . . . only if a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Hedgepeth, however, does not identify any "particular employment practice" that causes a disparate impact on the basis of race, (*id.*), and she does not address the issue in her Response, (*see* Mem. Resp. Mot. Summ. J). Because Hedgepeth does not identify any discriminatory practice utilized by Capital One, the Court will treat Count I as solely alleging a claim of disparate treatment under Title VII.

A.      **Failure to Promote Claims**

The Court determines that, even viewing the record in the light most favorable to Hedgepeth, Capital One is entitled to summary judgment on Hedgepeth's failure to promote claims contained within Counts I, III and VII.

1.      **Legal Standard:  Failure to Promote Under Title VII**[14]

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1).  Because Hedgepeth has not proffered direct evidence of discrimination on the basis of race, the Court will analyze her failure to promote claim under the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005).[15]

---

[14] Although Hedgepeth brings failure to promote claims under both Title VII and 42 U.S.C. § 1981, race discrimination claims under both statutes are analyzed under the same framework. *See Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 n.3 (4th Cir. 2003) ("In failure-to-promote cases such as this, the framework of proof for disparate treatment claims . . . is the same for actions brought under Title VII, or § 1981, or both statutes") (citations omitted).  Accordingly, the Court will consider Hedgepeth's § 1981 and Title VII claims together and will refer to the legal standard governing her race discrimination claims as the Title VII standard.

[15] As one Circuit Judge for the United States Court of Appeals for the Fourth Circuit remarked in *Anderson*:

> [e]mployers are, on the whole, too sophisticated to profess their prejudices on paper or before witnesses.  The Supreme Court [of the United States] in *McDonnell Douglas*, recognizing the necessity in most instances of reliance on circumstantial evidence, laid down rules of proof under which direct evidence of discriminatory intent is not necessary to the making of a *prima facie* case.

*Anderson*, 406 F.3d at 283 n.5 (internal citations omitted) (Gregory, J., dissenting in part).

Hedgepeth must prove that she was treated less favorably than other applicants because of her race. *Id.* To establish a *prima facie* case of failure to promote on the basis of race, a plaintiff must establish that "(1) [he or] she is a member of a protected group, (2) [he or] she applied for the position in question, (3) [he or] she was qualified for that position, and (4) the defendants rejected [his or] her application under circumstances that give rise to an inference of unlawful discrimination." *Anderson,* 406 F.3d at 268; *see also Harris v. Rumsfeld*, 428 F. Supp. 2d 460, 466 (E.D. Va. 2006).

If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the decision to deny [the plaintiff] the promotion." *Harris*, 428 F. Supp. 2d at 466 (quoting *Anderson*, 406 F.3d at 268). After the employer states its reasons for its employment decision, the plaintiff may "show that the stated reason is a pretext for discrimination . . . and the trier of fact must determine if the plaintiff has proved that the employer intentionally discriminated against [him or] her because of [his or] her race." *Anderson*, 406 F.3d at 268. "A plaintiff may establish pretext by proving that the defendant's explanation for an employment decision is 'unworthy of credence' or that the defendant's explanation is false." *Id.* (internal citations omitted). For example, a plaintiff may establish pretext by "showing that he [or she] was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006).

"When a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the sound business judgment of the employer." *Id.* at 261. But where a plaintiff has made a "strong

showing that his [or her] qualifications are demonstrably superior" to the chosen candidate, he or she has provided sufficient evidence of pretext to survive summary judgment. *Id.* at 261–62.

When weighing the presence of pretext, the Court should "assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question." *Harris*, 428 F. Supp. 2d at 466 (internal citations omitted). "The crucial issue in a Title VII case is whether the employer has an unlawfully discriminatory motive, not the wisdom or folly of the employer's business judgments." *Id.* A plaintiff cannot raise a "triable issue by selecting from the many criteria used in the promotions process the one factor on which he or she may conceivably compare." *Hux v. City of Newport News*, 451 F.3d 311, 317 (4th Cir. 2006).

## 2.    Legal Standard:  Failure to Promote Under the ADEA

The ADEA "prohibits employers from refusing to hire, discharging, or otherwise discriminating against any person who is at least 40 years of age because of the person's age." *EEOC v. Balt. Cnty.*, 747 F.3d 267, 272 (4th Cir. 2014). As with her Title VII claim, Hedgepeth does not present the Court with direct evidence of discrimination, so her failure to promote claim on the basis of age must be analyzed under the *McDonnell Douglas* burden-shifting framework.[16]

To establish a *prima facie* case of failure to promote on the basis of age, a plaintiff "must demonstrate that:  (1) he [or she] was a member of a protected class, i.e., that he [or she] was at least 40 years old; (2) his [or her] employer had an open position for which he [or she] applied and was qualified; (3) he [or she] was rejected despite his [or her] qualifications; and (4) the

---

[16] Here, for clarity, the Court outlines separate standards for failure to promote claims under Title VII and the ADEA. The Court, however, notes that a number of courts in the Fourth Circuit have applied Title VII's proof scheme to failure to promote claims under the ADEA. *See Gurganus v. Beneficial N.C, Inc.*, 25 F. App'x 110, 111 (4th Cir. 2001) (applying Title VII proof scheme to ADEA failure to promote claim); *Burgoon v. Potter*, 369 F. Supp. 2d 789, 792 n.1 (E.D. Va. 2005) ("[T]he standards relating to the burdens and order of proof in Title VII cases also apply in ADEA cases.").

position remained open or was filled by a similarly qualified applicant who was substantially younger than the plaintiff, whether within or outside the class protected by the ADEA." *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006).

Once the plaintiff makes a *prima facie* case of failure to promote due to age, as in Title VII, the burden shifts to the defendant "to articulate a legitimate, non-discriminatory reason for its adverse employment decision." *Id.* If the defendant does so, again "the plaintiff must show that the articulated reason is a pretext for discrimination." *Kirkland v. Mabus*, 206 F. Supp. 3d 1073, 1080 (E.D. Va. 2016) (quoting *Laber*, 438 F.3d at 430–31). "The plaintiff must do more than simply show the articulated reason is false; he [or she] must also show that the employer discriminated against him on the basis of age." *Id.* However, in certain instances, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

**B.    The Court Will Grant Summary Judgment on the Failure to Promote Claims Because Hedgepeth Cannot Show That Capital One's Employment Decision Was a Pretext for Discrimination**

Hedgepeth does not raise a dispute of material fact sufficient to foreclose summary judgment on her failure to promote claims because the record demonstrates that Capital One's employment decision was not grounded in a pretext for discrimination. Hedgepeth submits that Capital One failed to promote her to two roles on account of her race and age: (1) the Process Coordinator position in QMO; and, (2) the Associate Relations Consultant position in HR. (*See* Am. Compl. ¶¶ 11–15.) The Court analyzes Capital One's decision not to promote Hedgepeth to either position in turn.

First, regarding the Process Coordinator position, the Court finds that while Hedgepeth sets forth a *prima facie* case of discrimination under Title VII and the ADEA, she does not show

that Capital One's legitimate, non-discriminatory reasons for promoting the eventual successful candidate, Albadani, over her were pretextual. Second, regarding the Associate Relations Consultant position, Hedgepeth does not make out a *prima facie* case for discrimination because she does not show that she was qualified for the position. Even if Hedgepeth could establish a *prima facie* case for the Associate Relations Consultant position, she does not submit sufficient evidence that Capital One's final employment decision was pretextual.

### 1. The Process Coordinator Position: Hedgepeth Does Not Submit Evidence Showing that Capital One's Reasons for Promoting Albadani Over Her Were Pretextual

Although Hedgepeth establishes a *prima facie* case of discrimination under both Title VII and the ADEA, she does not offer evidence sufficient to allow a reasonable juror to conclude that Capital One's decision to promote Albadani over her was pretextual.

#### a. Hedgepeth Makes a *Prima Facie* Case of Discrimination Under Title VII and the ADEA

As an initial matter, Hedgepeth sets forth a *prima facie* case for failure to promote under both Title VII and the ADEA.

Under Title VII, Hedgepeth satisfies the first two prongs of the *prima facie* test: she is a member of a protected class (African American), and she applied for the position in question. *See Anderson,* 406 F.3d at 268. As to the third prong, Hedgepeth was "qualified for that position," *id.*, as demonstrated by the fact that she was one of nine applicants interviewed out of forty-seven for the Process Coordinator position, (June 6, 2017 Email Regarding Process Coordinator). Finally, Hedgepeth meets the fourth prong because Capital One "rejected her application under circumstances that give rise to an inference of unlawful discrimination," *Anderson,* 406 F.3d at 268, because Capital One promoted Albadani, who was not African American. *See Carrier-Tal v. McHugh*, No. 2:14cv626, 2016 WL 9016633, at *10 (E.D. Va.

29

Apr. 15, 2016) ("To satisfy the fourth prong, Plaintiff need only show that the position was filled by an applicant who was not a member of her protected group.") (citations omitted).

Similarly, under the ADEA, Hedgepeth makes out a *prima facie* case of age discrimination for the Process Coordinator position. Hedgepeth: (1) was above the age of forty at the time she applied for the opening and thus "a member of [the] protected group;[17]" (2) she applied for the "open position" in question and was, for the reasons discussed above, "qualified;" (3) she was rejected despite her qualifications; and, (4) the position was filled by someone substantially younger than her—the thirty-year-old Albadani. *Laber*, 438 F.3d at 430.

Because Hedgepeth has set forth a *prima facie* case of failure to promote on account of her race and age, the burden shifts to Capital One, under the *McDonnell Douglas* framework, "to articulate a legitimate, non-discriminatory reason" for promoting Albadani over Hedgepeth. *Laber*, 438 F.3d at 430; *Harris*, 428 F. Supp. 2d at 466 (quoting *Anderson*, 406 F.3d at 268). The Court finds that Capital One does so here.

**b.     Capital One Articulates a Legitimate Non-Discriminatory Reason for Promoting Albadani, and Not Hedgepeth, to the Process Coordinator Position**

The Court finds legitimate Capital One's articulated non-discriminatory reason for promoting Albadani over Hedgepeth: the performance of both candidates in their respective interviews. Capital One deemed Albadani the better interviewee which this Court sees as legitimate given her having actually performed the duties of a Process Coordinator.

Courts in the Eastern District of Virginia have consistently observed that interview performance constitutes a legitimate non-discriminatory reason for selecting one job applicant over another. In *Harris*, the district court found that the plaintiff's "poor interview performance"

---

[17] At the time that she applied for the Process Coordinator position, Hedgepeth was sixty-one (61) years old. (Am. Compl. ¶ 72; Hedgepeth Dep. 2.)

coupled with her promoted colleagues' higher interview scores, reflected a legitimate non-discriminatory reason for declining to promote the plaintiff. 428 F. Supp. 2d at 467. In that case, the Court found the employer "well within its bounds to promote [other candidates] both of whom had higher interview scores than [the plaintiff]." *Id.* at 469; *see also Carrier-Tal*, 2016 WL 9016633, at *15 (finding interviewer's "subjective assessment" of three candidates' interviews to be valid reason for employment decision); *McIntyre v. City of Chesapeake*, No. 3:14cv449, 2015 WL 2064007, at *8 (E.D. Va. Apr. 30, 2015) (determining that "undisputed evidence" that the successful candidate "was selected for promotion because he earned the highest interview score of the five candidates who interviewed" constituted a legitimate reason for an employment decision).

Here, the undisputed evidence indicates that Albadani outperformed Hedgepeth in the interview process for the Process Coordinator role. At the time, Brian Palmer, Albadani's interviewer, gave Albadani a score of "Strong Recommend" for the position, and ranked her as a "Medium" in the "Additional Questions" and "Interests and Motivations" categories, and "High" in "Past Work Experiences/Job Specific Skills" category. (Albadani Interview Report 1.) In his "Summary Notes and Reason for Recommendation," Palmer explained that Albadani had already "done the work of a [Process Coordinator] in many situations through her time in QMO" and that he "[felt] like [Albadani] has the drive and enthusiasm to learn and take on the challenge." (*Id.*) Palmer repeated his positive impression of Albadani's interview answers during his 30(b)(6) deposition, stating that she "was exceptional . . . was very much able to describe to us exactly why she wanted to move on . . . and she was very much in alignment with what we were looking for in the role." (30(b)(6) Palmer Dep. 8.)

31

In contrast, Hedgepeth's interviewer, Breeze Fennel, rated Hedgepeth as "Do Not Recommend" and ranked her as a "Medium" in "Interests and Motivations" and as a "Low" in "Additional Questions" and "Past Work Experiences/Job Specific Skills." (Hedgepeth Interview Report 1.) Of concern to the interviewer, Hedgepeth focused on "root cause analysis" rather than providing "examples of what skills should [sic] would bring to help the team succeed as a whole." (*Id.* 5.) In the summary notes, Fennel indicated that

> [t]he candidate does seem to be very detail-oriented, but during the conversation, *seemed to lack an understanding of expectations of the role*. Examples of strengths she would bring to the role were vague and focused on contributions of an individual contributor and not that of a team.

(*Id.* 1 (emphasis added).) Fennel also stated that Hedgepeth's "explanations of interest in role and strengths to bring to role were unclear." (*Id.*)

Hedgepeth thus scored significantly lower than Albadani in overall rating, and lower than Albadani on two of Capital One's three rating categories. (*Id.*) And while Albadani's interviewer determined that Albadani had "done the work of a [Process Coordinator] in many situations" and had "the drive and enthusiasm to learn and take on the challenge," (Albadani Interview Report 1), Hedgepeth's interviewer found that Hedgepeth "seemed to lack an understanding of expectations of the role" and was "focused on contributions of an individual contributor," (Hedgepeth Interview Report 1). Having "done the work of a [Process Coordinator]" before, the Court finds sensible Albadani's ability to articulate in her interview "why she wanted to move on" and Palmer's impression that "she was very much in alignment with what we were looking for in the role." (Albadani Interview Report 1; 30(b)(6) Palmer Dep. 8.) The undisputed record shows that "Past Work Experience/Job Specific Skills" was one of just three criteria on which the candidates were measured. (Albadani Interview Report 1.)

32

Albadani's previous experience leads the Court to find Palmer's positive impression and Albadani's "Strong Recommend" score legitimate rather than pretext for discrimination. (*Id.*)

Assessing Albadani and Hedgepeth's "relative job qualifications based on the criteria that the employer has established as relevant to the position in question" *Harris*, 428 F. Supp. 2d at 466 (citation omitted), Capital One has shown a legitimate, non-discriminatory reason for elevating Albadani over Hedgepeth.[18]

Because Capital One has shown a legitimate reason for its employment decision, the burden shifts back to Hedgepeth to "show that the stated reason is a pretext for discrimination." *Anderson*, 406 F.3d at 268 (analyzing Title VII); *see also Kirkland*, 206 F. Supp. 3d at 1080 ("[T]he plaintiff must show that the articulated reason is a pretext for [age] discrimination.").

---

[18] Hedgepeth broadly disputes Capital One's evidence regarding her interview for the Process Coordinator position, arguing that Hedgepeth has "unequivocally stated that . . . Fennell has never interviewed her for any position while employed at Capital One." (Mem. Resp. Mot. Summ. J. 13.) Hedgepeth suggests that the alleged discrepancy in interviewers raises the possibility that "the actual interviewer was unwilling to . . . say what [Capital One] wanted him to say, so the switch was made." (*Id.*) Hedgepeth submits that Capital One "has no way of proving that Plaintiff responded to the actual questions in the manner suggested." (*Id.*)

Despite Hedgepeth's contentions, she advances no material facts or evidentiary basis to demonstrate that: (1) a Capital One employee other than Fennel interviewed her; or, (2) she gave different responses during the interview than those reflected in the interview sheet submitted by Capital One. In the Fourth Circuit, "[u]nsubstantiated, conclusory claims without evidentiary support are insufficient to satisfy a non-moving party's burden on summary judgment." *Braithwaite v. Hinkle*, 752 F. Supp. 2d 692, 694 (E.D. Va. 2010) (citing *Carter v. Ball*, 33 F.3d 450, 461–62 (4th Cir. 1994)); *see also DiQuollo v. Prosperity Mortg. Corp.*, 984 F. Supp. 2d 563, 570 (E.D. Va. 2013) ("The law is well established that uncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment") (citation omitted).

Here, Hedgepeth's self-serving testimony, uncorroborated by any other evidence, that someone other than Fennel interviewed her, (Hedgepeth Decl. ¶ 21), is insufficient to create a material dispute of fact. *DiQuollo*, 984 F. Supp. 2d at 570. Furthermore, Hedgepeth has not submitted a scintilla of evidence that Hedgepeth's interview sheet did not reflect her answers given during the interview. To the contrary, her deposition testimony indicates that Hedgepeth stated "the information [in the interview report] is similar to what kind of conversation I had with Matt [Saunders] when interviewing for the position." (Hedgepeth Dep. 28.) Hedgepeth does not create a dispute of material fact as to her interview performance because she agrees that the interview sheet accurately reflected her conversation. (*Id.*)

Hedgepeth does not create a triable issue of material fact as to whether Capital One's stated reasons for promoting Albadani over her were a pretext for discrimination.

### c. Hedgepeth Does Not Show that Capital One's Reasons for Promoting Albadani over Her Were Pretextual

Hedgepeth does not show that Capital One's legitimate, non-discriminatory reasons for its employment decision are "pretextual," "unworthy of credence," or "false." *Anderson*, 406 F.3d at 268.

In her Amended Complaint and Response, Hedgepeth suggests that: (1) Palmer and Fennel were aware of her various complaints of discrimination against her then-manager, Prokop; (2) Hedgepeth was more qualified than Albadani; (3) the delay in entering changes to Hedgepeth's 2016 Review harmed Hedgepeth's chances during the interview process; and, (4) Capital One engaged in a conspiracy against Hedgepeth and preselected Albadani for the position. (Mem. Resp. Mot. Summ. J. 14–15; Am. Compl. ¶ 15.) The Court will address, and reject, each of these contentions in turn.

### i. The Hiring Team's Awareness of Internal Complaints by Hedgepeth Against Prokop

To rebut Capital One's reasons for hiring Albadani, Hedgepeth argues that Palmer and Fennel—both members of the Process Coordinator hiring team—were aware of Hedgepeth's various complaints against Prokop. In support of this contention, Hedgepeth states that because "[m]anagers work together to calibrate the assignment of end-of-year ratings based on Senior Coordinators' relative performance to one another," Fennel, "as a Unit Manager in QMO would have been involved in the Year End Appraisal ranking." (*Id.* 14 (citing Salesforce Case 20170302-1002076).) From this, Hedgepeth argues that one can "reasonably conclude that . . . Fennell had knowledge of the Year End Appraisal of the Plaintiff and the concerns referenced

against her then Manager, Mark Prokop." (*Id.* 14–15.) She further argues that "all managers including Brain Palmer would have had access to the information presented in Hedgepeth's yearly review." (*Id.* 12.) The Court finds this contention insufficient for two reasons.

First, the evidence, even viewed favorably to Hedgepeth, does not support Hedgepeth's assertions that Palmer or Fennel knew of Prokop's claims of discrimination.[19] Rather, the record demonstrates that Hedgepeth's assertion that Fennel and Palmer had access to her complaints of discrimination does not align with the applicable timeline involving Hedgepeth's 2016 Review. While Fennel and Palmer may have had access to Hedgepeth's file in formulating the 2016 Review, Hedgepeth did not make her first complaint against Prokop until late February 2017. (February 28, 2017 Email Chain.) Therefore, neither Palmer nor Fennel could have seen in late 2016 (when the QMO managers formulated the 2016 Review) that Hedgepeth had initiated any complaints against Prokop.

Second, even if the evidence did support some knowledge on the part of Palmer, such knowledge would be insufficient to show that Capital One's articulated reason for its employment decision was false. Assuming *arguendo* that Palmer had been aware of Hedgepeth's complaints against Prokop,[20] Palmer's mere awareness of those complaints would

---

[19] Notably, although Hedgepeth argues that Prokop treated her unfairly, the evidence does not show that Prokop was involved in the hiring for either the Process Coordinator or Associate Relations Position. And while Capital One's investigation of Hedgepeth's claims determined that two associates thought Prokop "treat[ed] associates unfairly," (Salesforce Case 20170428-1039550, at 3), Capital One concluded that these complaints were based off the observations of two team members, (*see id*).

[20] Hedgepeth does state, in an otherwise unsupported declaration, that "Brian Palmer claimed to EEOC that he had no knowledge of my complaint against Mark Prokop but stated that Jeffrey Nelson had asked him to talk with me about the concerns with Prokop around May or June 2017." (Hedgepeth Decl. ¶ 19.) Palmer, in his 30(b)(6) Deposition, maintains that he had no knowledge of any such conversation and became aware of Hedgepeth's complaint "through this [litigation] only." (30(b)(6) Palmer Dep. 4.) Hedgepeth's unsworn statement to the contrary, however, constitutes "an unsubstantiated, conclusory claim[] without evidentiary

not create a dispute of material fact as to whether Capital One's stated employment decision was "unworthy of credence or . . . false." *Anderson*, 406 F.3d at 268. The evidence indicates that Fennel, who did not have knowledge of Hedgepeth's complaints, recommended against hiring Hedgepeth for the Process Coordinator position. (*See* Hedgepeth Interview Report.) At the summary judgment stage, Hedgepeth does not show a dispute of material fact as to Capital One's rationale for choosing Albadani over Hedgepeth by positing that one member of the hiring team *might* have potentially known information about Hedgepeth that he *might* have viewed unfavorably. Because such evidence "is merely colorable, or is not significantly probative," *Liberty Lobby*, 477 U.S. at 249–50, the Court must grant summary judgment.

### ii. Hedgepeth's Qualifications Compared to Albadani's

Second, Hedgepeth argues that Capital One's reasons for promoting Albadani were a pretext for discrimination because Hedgepeth was more qualified than Albadani. Hedgepeth states that:

> Plaintiff has worked with Voice monitoring and Albadani had been limited to case work and had no experience working with Voice calls or as a Team leader in this area and did not display any continued learning in the field and only possessed a High School Education.

(Mem. Resp. Mot. Summ. J. 15.)

While in the Fourth Circuit a plaintiff may defeat summary judgment by "showing that he [or she] was better qualified" than the successful candidate, Hedgepeth does not demonstrate that her qualifications were "demonstrably superior" to those of Albadani for two reasons. *Heiko*, 434 F.3d at 261 ("When a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the

---

support" disfavored in this circuit. *Braithwaite*, 752 F. Supp. 2d at 694. Even if considered, for the reasons stated above, this assertion does not create a dispute of material fact sufficient to foreclose summary judgment.

sound business judgment of the employer.")  First, outside of interview performance, Hedgepeth

and Albadani were similarly qualified.  Second, as numerous courts within the Fourth Circuit

have held, an employer may utilize interview performance to assess candidates' qualifications

for a position, and in that important metric, Albadani substantially outperformed Hedgepeth.

Moreover, even outside of their interview performance, Hedgepeth's qualifications were

"similar or only slightly superior to those of [Albadani]," and assuming Capital One's

"promotion decision [would] remain[] vested in [its] sound business judgment."  *Id.*  Both

candidates had worked in the same position in QMO for several years:  Albadani for four years

and two months and Hedgepeth for five years and ten months.  (June 6, 2017 Email Regarding

Process Coordinator 2.)  The hiring team chose both candidates for interviews out of the original

forty-seven applicants, demonstrating that it viewed both candidates as meeting the basic

qualifications for the position.  (*Id.*)  And, while Hedgepeth argues that Albadani's experience

had "been limited to case work and had no experience working with Voice calls or as a Team

leader in this area," the undisputed facts contradict these bare, unsupported assertions.  (Mem.

Resp. Mot. Summ. J. 15. (citing Albadani Resume).)  For instance, Albadani's resume states that

she had experience with "voice and non-voice engagements to guarantee adherence to federal

regulatory bodies and internal processes," indicating that Albadani possessed experience with

voice calls.  (Albadani Resume.)  More on point, Palmer determined that Albadani had "done the

work of a [Process Coordinator] in many situations" during a process in which "Past Work

Experience/Job Specific Skills" constituted one third of the evaluation criteria.  (Albadani

Interview Report 1).  Meanwhile, Hedgepeth cites to no evidence that she had worked as a

"Team leader in this area" or displayed "continued learning in the field" to the extent that she was more qualified than Albadani in those areas. (Mem. Resp. Mot. Summ. J. 15.)[21]

In any event, Capital One was entitled to rely on the candidates' respective interview performance in evaluating their qualifications. Where similarly qualified candidates interview for a position, courts in the Fourth Circuit have routinely found that an employer may rely on interview scores in assessing their qualifications. "Interviews are an important tool that employers use to make all sorts of hiring decisions, and [the court] may not lightly overturn the reasonable conclusions an employer reaches after actually meeting with a candidate face-to-face." *Hux*, 451 F.3d at 319. The interview process thus serves not only as a valid reason for choosing one candidate over another but as an important and even integral factor in weighing a candidate's qualifications for a job. *See also McIntyre*, 2015 WL 2064007, at *9 ("Defendant's decision to promote [a candidate] after he earned the top interview score suggests that the very purpose of the interview was to determine who among the qualified applicants was *most* qualified for the position") (emphasis in original); *Harris*, 428 F. Supp. 2d at 468 ("The purpose of the interview itself was to assess the relative skills of the applicants."). The uncontroverted record reflects that Albadani outperformed Hedgepeth during the interview process. Capital One

---

[21] Additionally, while Hedgepeth may have viewed her college education to be an important qualification, Capital One listed a "High School Diploma, GED, or equivalent experience" as the basic qualification. (*Id.*) Hedgepeth cannot show she was more qualified than Albadani purely on the basis of her academic credentials, especially when Albadani met the basic requirements of the job including at least some direct experience. *See Anderson*, 406 F.3d at 270 (finding higher academic credentials insufficient to raise triable issue of material fact on failure to promote claim where both candidates met basic qualifications); *McIntyre*, 2015 WL 2064007, at *9 (finding a plaintiff's superior "academic credentials" compared to the successful candidate did not show pretext when both candidates met the employer's qualification for the job). A plaintiff cannot raise a "triable issue by selecting from the many criteria used in the promotions process the one factor on which he or she may conceivably compare." *Hux*, 451 F.3d at 317.

was entitled to rely on each candidates' respective interview performance in assessing their qualifications and weigh each candidates' responses in assessing their ability to perform the tasks of the Process Coordinator position.

Considering the record as a whole and viewing it in the light most favorable to Hedgepeth, the Court finds she does not create a triable issue of material fact as to whether she was more qualified than Albadani. Even presuming both candidates possessed similar qualifications and experience at Capital One, Albadani significantly outperformed Hedgepeth during their respective interviews. Although Albadani was younger than Hedgepeth and not African American, Capital One was entitled to rely on Albadani's relevant previous work experience in that same role and the interview score not only to promote Albadani, but also to conclude that Albadani was more qualified for the Process Coordinator role itself. Because Hedgepeth does not show that her qualifications were "demonstrably superior" to Albadani's, *Heiko*, 434 F.3d at 261, she does not show a dispute of material fact indicating pretext sufficient to defeat summary judgment.

### iii.   Delays in Entering Changes to 2016 Review

Hedgepeth also claims that Capital One's delay in entering changes to her 2016 Review "impacted the decision making process" for the Process Coordinator position. (Am. Compl. ¶ 15; Hedgepeth Dep. at 221:1–21.)

The record does not support this contention. First, the undisputed facts state that managers, such as Nelson, could view Hedgepeth's revised 2016 Review even if she could not. (Salesforce Case 20170428-1039550, at 7.) On June 26, 2017, Nelson stated: "I looked over [Hedgepeth's] shoulder and indeed, for some reason, she can no longer see her 2016 [Review] in Workday (even though I can). I . . . emailed her a PDF version to reference in the meantime."

39

(*Id.*)  Nelson's statement demonstrates that the managers involved in the Process Coordinator hiring decision could view Hedgepeth's revised (and more favorable) 2016 Review at the time of her application.  Second, Hedgepeth has submitted no evidence that any decision maker on the hiring team utilized or otherwise relied on the content of the 2016 Review in making their decision outside the initial screening for interviews.  (*See* June 6, 2017 Email Regarding Process Coordinator).  Without any such evidence, Hedgepeth does not raise a dispute of material fact sufficient to foreclose summary judgment.

### iv.     Management Conspiracy to Deny Hedgepeth the Process Coordinator Position and Preselect Albadani

Finally, read favorably, Hedgepeth alleges a broad conspiracy to deny her the promotion to Process Coordinator, claiming the hiring process was "orchestrated by Jeff Nelson, Brian Palmer and Mark Prokop" and that she "believe[s] they had preselected [Albadani] for th[e] position."  (Hedgepeth Dep. 29.)  "Vague and conclusory" allegations of an employment conspiracy, without supporting evidence, are insufficient to "stave off" summary judgment. *Brown v. Flowers*, 196 F. App'x 178, 182 (4th Cir. 2006) (citing *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998) ("conclusory statements, without specific evidentiary support, cannot support an actionable claim" at the summary judgment stage)).  And Hedgepeth has not submitted any evidence of such a conspiracy or that the hiring team preselected Albadani.  Furthermore, even if management had preselected Albadani, preselection does not by itself prove race or age discrimination.  Because preselection "would work to the detriment of all applicants for the job," *Carrier-Tal*, 2016 WL 9016633, at *15 n. 7 (quoting *Anderson*, 406 F.3d at 271), Hedgepeth does not show that Capital One preselected Albadani in order to discriminate against Hedgepeth on the basis of race or age.

Because Hedgepeth has not provided any evidence of a conspiracy to pretextually deny Hedgepeth the promotion, and evidence of pretext alone would not necessarily show race or age discrimination, summary judgment is appropriate.

> **d.      Hedgepeth Does Not Create a Dispute of Material Fact as to Whether Capital One's Failure to Promote Her to the Process Coordinator Position Was Pretextual**

Considering the evidence and drawing all "reasonable inferences . . . therefrom in the light most favorable to [Hedgepeth]," *Liberty Lobby*, 477 U.S. at 255, the Court finds that Hedgepeth has not shown that Capital One's stated reliance on interview performance in its hiring was false, unworthy of credence, or pretext for race or age discrimination. *Anderson*, 406 F.3d at 268; *Laber*, 438 F.3d at 430–31. Despite the candidates' differences in age and race, Albadani had relevant work experience in that she had "done the work of a [Process Coordinator] in many situations . . . [such that her] previous skills demonstrated she [would be] able to get in and work in the team." (Albadani Interview Report 1.) Likely because of this experience, Albadani more clearly articulated "why she wanted to move on" and how she "align[ed] with what [Capital One was] looking for in the role." (*Id.*) Therefore, Capital One's decision not to promote Hedgepeth to the Process Coordinator position cannot support a claim for race or age discrimination in Counts I, III and VIII, nor can it provide an "adverse employment action" or "adverse action" in any other claim.

### 2. The Associate Relations Consultant Position: Hedgepeth Fails to Make a *Prima Facie* Case of Discrimination Because She Was Not Qualified for the Position

Hedgepeth does not make out a *prima facie* case of discrimination for Capital One's failure to promote her to the Associate Relations Consultant because she does not show she was qualified for the position. Indeed, she conceded during the EEOC investigatory process that the successful applicant was more qualified than she.

### a. Hedgepeth Cannot Demonstrate She Was Qualified for the Associate Relations Consultant Position

To state a failure to promote claim, Hedgepeth must show under both Title VII and the ADEA that she was "qualified" for the position in question. *Anderson,* 406 F.3d at 268; *Laber,* 438 F.3d at 430. Hedgepeth does not do so for two reasons.

The Court first recognizes that Hedgepeth cannot show that she was qualified for the Associate Relations Consultant position because it was posted two levels above her current position at Capital One. The position was posted at the "Associate" level. (Associate Relations Consultant Job Description.) On May 26, 2017, several days before Hedgepeth applied to the Associate Relations position, the hiring manager for the position stated that Capital One was "looking for a high performing Principal Associate (ready for promotion) or an Associate for the role . . . we are not able to consider coordinator and senior coordinator level associates at this time." (Lockhart Email Chain.) At the time, Hedgepeth was a Senior Coordinator and did not meet the hiring criteria for the position. Accordingly, by Capital One's internal criteria, she was not qualified the position. (*See id.*)

Hedgepeth also did not have sufficient human resources experience for the position. The Associate Relations Consultant job description notes that the basic qualifications for the position include at least one year of customer service work and one year of human resources work.

42

(Associate Relations Consultant Job Description 1). The job description further detailed that the preferred qualifications included two years of customer service and two years of human resources experience. (*Id.*) Hedgepeth does not submit evidence showing that she possessed human resources experience at any point in her career. Hedgepeth therefore has not submitted any evidence that she was qualified for the position.

Notably, Hedgepeth previously waived this claim before the EEOC. Hedgepeth explicitly conceded in her EEOC response that: "[w]ith regard to the promotion for HR Associate, although I felt I was qualified for the position, the person who was selected I felt was better qualified and therefore I am not contesting not receiving this promotion." (Hedgepeth EEOC Resp. 1.) Because Hedgepeth previously admitted that the successful applicant was "better qualified" than her, Hedgepeth cannot show that Capital One's decision not to promote her was on account of her race or her age and not due to the successful candidate's superior qualifications. (*Id.*)

Because Hedgepeth has not set forth evidence that would allow a reasonable juror to conclude that she has made a *prima facie* case for failure to promote on the basis of race or age, the Court must grant Summary Judgment as to the Associate Relations Consultant failure to promote claim.

### C.    Conclusion:  Failure to Promote Claims

Because Count VII, fairly read, brings only a failure to promote claim pursuant to the ADEA, the Court will grant Summary Judgment as to Count VII in its entirety. The Court will grant Summary Judgment to Capital One on the failure to promote claims contained within Counts I, III, and VII. The Court now proceeds to consider Hedgepeth's remaining three claims.

**D.**     **Counts I & III:  Title VII & Section 1981 Disparate Treatment Claims**

Noting that she cannot support her claims of race or age discrimination with Capital

One's hiring decisions for the Process Coordinator or Associate Relations Consultant roles, and

because her compensation, terms, conditions or privileges of employment have not changed, the

Court finds that Hedgepeth has not provided evidence of any "adverse action" or "materially

adverse action" sufficient to create a dispute of material fact sufficient to prevent summary

judgment.[22]  Therefore, the Court will grant the Motion for Summary Judgement as to

Hedgepeth's claims of disparate treatment on account of race as stated in Counts I and III.

**1.**     **Legal Standard:  Disparate Treatment Under Title VII**

Title VII states that employers cannot "discriminate against any individual with respect to

his [or her] compensation, terms, conditions, or privileges of employment because of such

individual's race . . . [or] sex."  42 U.S.C. § 2000e-2(a)(1).  42 U.S.C. § 1981 states:

> [a]ll persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens, and shall be subject
> to like punishment, pains, penalties, taxes, licenses, and exactions of every kind,
> and to no other.

42 U.S.C. § 1981.

Disparate-treatment claims are the most "easily understood type of discrimination.  The

employer simply treats some people less favorably than others because of their race, color,

religion, sex, or national origin."  *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324,

---

[22] Capital One also argues that Hedgepeth failed to exhaust her administrative remedies
regarding a number of discrete acts of discrimination, set forth below, because they are
"reasonably related" to her EEOC complaint, and she did not raise them before the EEOC.  (*See*
Mem. Supp. Mot. Summ. J. 23–24.)  Nonetheless, because the Court concludes that Hedgepeth
has failed to identify any adverse employment action or materially adverse action to support her
claims disparate treatment or retaliation, the Court does not reach this argument.

335 n.15 (1977).  "A disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 877, 986 (1988)).

When no direct evidence of discriminatory intent exists,[23] the plaintiff must proceed under the *McDonnell Douglas* burden shifting framework.  *See McDonnell Douglas*, 411 U.S. at 792.  Under this standard, the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination.  *Id.* at 802.  To establish a *prima facie* case of race or gender discrimination a plaintiff must establish:  (1) that he or she is a member of a protected class; (2) that his or her job performance was satisfactory; (3) that he or she was subject to an adverse employment action by his or her employer; and, (4) that similarly situated employees outside of his or her protected class received more favorable treatment.  *Id.*; *see Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (applying similar factors to a Title VII gender discrimination claim).

Courts have also articulated the third element as "at the time the employer took the adverse employment action he [or she] was performing at a level that met his employer's legitimate expectations."  *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (citation omitted). After the plaintiff establishes this *prima facie* case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.

The Supreme Court has stated that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (citations omitted).  "A

---

[23] As stated above, Hedgepeth does not argue that she has produced direct evidence of discrimination so the Court proceeds under the *McDonnell Douglas* burden shifting framework.

tangible employment action in most cases inflicts direct economic harm." *Id.* at 762; *see also Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015) (in Title VII sex discrimination claim, suggesting adverse action could include lower pay, demotion, failure to promote, failure to receive a bonus, or receiving significantly different responsibilities as part of a performance improvement plan).

However, "courts in the Fourth Circuit have held that neither the receipt of a negative performance evaluation nor the denial of a discretionary bonus constitute adverse employment actions under Title VII." *Harris v. The Vanguard Group, Inc.*, No. 3:15cv382, 2015 WL 9685565, at *3 (W.D.N.C. Nov. 6, 2015) (citing cases), *report & recommendation adopted at* 2016 WL 110600; *aff'd* 667 F. App'x 815 (4th Cir. 2016). Similarly, "neither oral nor written reprimands constitute the sort of adverse employment action cognizable under Title VII unless [the] plaintiff also alleges that the reprimand has potential collateral consequences that rise to the level of an adverse employment action." *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 819 (E.D. Va. 2016). "[A] poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (citing *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000)).

> ### 2.   Hedgepeth Does Not State a *Prima Facie* Claim for Disparate Treatment on Account of Her Race Because She Cannot Show Capital One Subjected Her to An Adverse Employment Action

Hedgepeth does not establish a *prima facie* claim of disparate treatment based on race because she does not demonstrate that she suffered an adverse employment action.

As the Court explained in the prior section, Hedgepeth's failure to promote claims cannot underlie her claims of disparate treatment.  Apart from her failure to promote claims, Hedgepeth advances three separate instances of what she views to be adverse employment actions: (1) "[c]onflicting and confusing work assignments;" (2) her "June 2018 scorecard;" and, (3) her "2018 PIP."[24]  (Mem. Resp. Mot. Summ. J. 23.)  The Court addresses each of these contentions in turn.

> #### a.   Conflicting Work Assignments

Hedgepeth submits that her manager Tinikia Coleman assigned her conflicting and confusing work assignments in May 2018 when Coleman failed to provide adequate clarification concerning how many monitors Hedgepeth was expected to complete, and that this instance supports her disparate treatment claim.  (Hedgepeth Coleman April Email Chain 1.) Specifically, Hedgepeth argues that the record shows that Coleman assigned her different goals than those reflected by other teams, and that the discrepancy in reported goals was not corrected. (*Id.*; Hedgepeth Coleman May Email Chain.)  Hedgepeth argues that this constitutes an adverse

---

[24] In her Amended Complaint, Hedgepeth also characterizes Prokop's email discussion with Hedgepeth about her process of raising payment errors as a reprimand.  (Am. Compl. ¶ 10; *see also* Prokop Hedgepeth October 27–28, 2016 Email Chain.)  Although Hedgepeth does not raise the issue on Summary Judgment, "neither oral nor written reprimands constitute the sort of adverse employment action cognizable under Title VII unless [the] plaintiff also alleges that the reprimand has potential collateral consequences that rise to the level of an adverse employment action." *Hinton,* 185 F. Supp. 3d at 819.  Because Hedgepeth does not identify any such "collateral consequences" rising to "an adverse employment action" stemming from this incident, Prokop's "reprimand" of Hedgepeth does not support a disparate treatment claim. *Id.*

employment action "in that it sets one up for failure, and then serves as the justification for catch phrases like 'not a good fit' or 'needs to work on communication skills.'" (Mem. Resp. Mot. Summ. J. 24.)

Even accepting the premise that Coleman assigned Hedgepeth confusing or conflicting work assignments, Hedgepeth does not demonstrate how those confusing or conflicting assignments led to any "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. At least at the time of briefing, Hedgepeth served in the same role, Senior Quality Assurance Coordinator, that she did when she was assigned the confusing work assignments. (Hedgepeth Employee Profile; Am. Compl. ¶ 9.) Moreover, Hedgepeth does not provide evidence of any "reassignment" or "change in benefits" that occurred following the allegedly confusing and conflicting work assignments. *Ellerth*, 524 U.S. at 761.

Even viewing the record as a whole and in the light most favorable to Hedgepeth, Coleman assigning her conflicting and confusing work assignments cannot underlie a claim for disparate treatment on the basis of race under Title VII or § 1981.

### b. The June 2018 Scorecard

Hedgepeth also submits that Coleman sending Hedgepeth the June 2018 Scorecard while she was out of the office constitutes an adverse employment action.

Reading the record in the light most favorable to Hedgepeth, because Coleman sent Hedgepeth her June 2018 Scorecard while she was out of the office, Hedgepeth was not able to dispute her score of "Meeting Expectations." (Coleman Scorecard Email 1.) Hedgepeth indicates that she would have disputed her score as "QMO agents are encouraged to . . . [do] if

48

they disagree with performance errors." (QMO Supplemental Expectations).  Hedgepeth states

that this action "whether or not it had a direct impact on her income, affects the Plaintiff

internally, and perhaps externally as well." (Mem. Resp. Mot. Summ. J. 23.)  "This process of

'papering' an employee . . . is not a new strategy." (*Id.*)

Hedgepeth does not indicate how her inability to dispute her rating in the June Scorecard,

which showed her "Meeting Expectations," led to a "significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

As stated above, Hedgepeth maintains the same position that she held when Coleman sent her the

June 2018 Scorecard.[25]  (Am Compl. ¶¶ 9, 47; Hedgepeth Emp. Profile.)

Because Hedgepeth has not offered any evidence demonstrating that the June Scorecard

resulted in an adverse employment action against her, the June Scorecard cannot support her

claims for disparate treatment on the basis of race under Title VII or § 1981.

### c.   The 2018 Performance Improvement Plan

In her Response, Hedgepeth states that Capital One recently placed her "on a

performance improvement plan, the likely result of which will be [Hedgepeth's] termination."

(Mem. Resp. Mot. Summ. J. 24–25.)

Hedgepeth, however, has submitted no evidence that Capital One placed her on a

performance improvement plan.  Neither the term "performance improvement plan" nor the

acronym "PIP" are mentioned in Hedgepeth's statement of undisputed material facts, nor

seemingly in any of the exhibits Hedgepeth submitted to the Court.  (*See* Mem. Resp. Mot.

---

[25] Mere speculation that the June 2018 Scorecard could conceivably hinder her employment prospects in the future does not constitute sufficient evidence to make out a *prima facie* case of an adverse employment action.

Summ. J. 2–20.) Because Hedgepeth has not properly presented the Court with evidence of any performance improvement plan, the Court cannot consider one here.

Even assuming, *arguendo*, that Capital One placed Hedgepeth on a performance improvement plan, such an action, without more, does not constitute an "adverse employment action." *Jensen-Graf*, 616 F. App'x at 598. Courts within the Fourth Circuit routinely hold that "[a]. . . performance improvement plan alone [does] not constitute materially adverse action." *Michael v. Va. Commonwealth Univ.*, No. 3:18cv125, 2019 WL 128236, at *4 (E.D. Va. Jan. 8, 2019) (citing *Emami v. Bolden*, 241 F. Supp. 3d 673, 685 (E.D. Va. 2017)). Additionally, as the Fourth Circuit has stated,

> [Plaintiff's] complaint fails to state a plausible discrimination claim because she has not alleged any action that could reasonably be considered an adverse employment action. She has failed to allege that she received lower pay, was demoted, was passed over for a promotion, failed to receive a bonus, or given significantly different responsibilities because she was placed on the [performance improvement plan]

*Jensen-Graf*, 616 F. App'x at 598. Hedgepeth, like the plaintiff in *Jensen-Graf*, does not allege that any negative employment consequence followed Capital One supposedly placing her on a performance improvement plan.

Because Hedgepeth does not submit evidence of any performance improvement plan, and placement on a performance improvement plan, without more, does not amount to an adverse employment action, the 2018 Performance Improvement Plan fails to support a *prima facie* claim of disparate treatment on account of race. Because Hedgepeth does not submit evidence that Capital One subjected her to an adverse employment action, she cannot sustain a *prima facie* case of disparate treatment on account of race under § 1981 or Title VII. The Court will grant Summary Judgment to Capital One as to Hedgepeth's claims of disparate treatment on account

of race brought in Counts I and III.  The Court now proceeds to Hedgepeth's claims of retaliation on account of race and age in Count IV, V, and VIII.

### E.        Counts IV, V, & VIII:  The Retaliation Claims

The Court will grant the Motion for Summary Judgment as to Hedgepeth's claims of retaliation on account of race and age under Title VII, § 1981, and the ADEA, as stated in Counts IV, V, and VIII.  Because Hedgepeth fails to present evidence that Capital One has taken any adverse employment action against her, she fails to state a *prima facie* case for retaliation under each statute.

### 1.        Legal Standard:  Retaliation under Title VII and the ADEA[26]

Title VII and the ADEA prohibit employers from retaliating against employees who oppose discrimination.  42 U.S.C. § 2000e-3(a).  Under both statutes, a court considers a retaliation claim using the now familiar *McDonnell Douglas* standard.  *See Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 312 (4th Cir. 2015) ("In the Fourth Circuit, the burden-shifting framework established in *McDonnell Douglas* . . . applies to Title VII claims, including . . . retaliation claims." (citations omitted)).  Under that framework, "the plaintiff must first establish a *prima facie* case of retaliation by showing:  '(1) [he or] she engaged in a protected activity; (2) the employer acted adversely against [him or] her; and (3) there was a causal connection between the protected activity and the asserted adverse action.'"  *Strothers v. City of Laurel*, 895 F.3d 317, 327–28 (4th Cir. 2018) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)).

---

[26] "Because the language of the retaliation provisions in Title VII and the ADEA are identical in material respects, Title VII precedent governs the burdens of proof under the ADEA."  *Krane v. Capital One Servs.*, 314 F. Supp. 2d 589, 610 n.21 (E.D. Va. 2004) (citations omitted).

As the Fourth Circuit has recently observed, the "scope of Title VII's anti-retaliation provision, § 2000e-3, is broader than the anti-discrimination provision." *Id.* at 327.  Namely, "the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his [or her] employment or by causing him [or her] harm *outside* the workplace." *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Nonetheless, retaliatory actions must prove "materially adverse—such that they might have dissuaded a reasonable worker from engaging in protected activity." *Id.* (internal citations omitted).

In determining whether an action is materially adverse, courts should "look at the particular circumstances of the alleged act of retaliation." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 186 (4th Cir. 2019) (quoting *Burlington*, 548 U.S. at 69).  Importantly, "[c]ontext matters." *Burlington*, 548 U.S. at 69.  "In many cases—perhaps the overwhelming majority of cases—the distinction between 'adverse employment action' and 'materially adverse action' is unlikely to change the outcome of a case." *Hinton*, 185 F. Supp. 3d at 830.

For instance, courts in the Eastern District of Virginia have observed that "reprimands, without collateral consequences, are not 'materially adverse.'" *Id.* at 832 (collecting cases). Similarly, the following do not constitute materially adverse actions:  "failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, an Attendance Warning . . . a formal letter of reprimand, or a proposed termination." *Id.* (collecting cases) (internal citations omitted); *see also Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011) (collecting cases that find attendance warnings, being placed on a performance

improvement plan, or formal letter of reprimands do not constitute adverse employment actions). While failing to respond to an employee's phone calls or assigning the employee to difficult work would not ordinarily rise to the level of a materially adverse employment action, denying a pregnant employee the opportunity to work from home after she testified in favor of another employee's discrimination claim might be. *Brockman v. Snow*, 217 F. App'x 201, 207 (4th Cir. 2007). And one court in the Eastern District of Virginia has determined that a university prohibiting an employee from taking classes at the school where employed, thus causing the employee to suffer harm outside the workplace, rose to the level of an adverse employment action. *See Hinton*, 185 F. Supp. 3d at 834–35.

**2.      Hedgepeth Does Not Create a Dispute of Material Fact As to Her Retaliation Claims Because She Does Not Provide Evidence of Any Materially Adverse Action Taken Against Her**

Viewing the evidence in the light most favorable to Hedgepeth, she does not create a dispute of material fact that Capital One took a "materially adverse action" against her and therefore cannot state a *prima facie* claim for retaliation under Title VII, § 1981, or the ADEA. As with her disparate treatment claim, Hedgepeth advances three instances of what she views to be materially adverse actions: (1) "[c]onflicting and confusing work assignments;" (2) her "June 2018 scorecard;" and (3), her "2018 PIP."[27] (Mem. Resp. Mot. Summ. J. 24.) For many of the same reasons above, and even under the less stringent standard of a "materially adverse action" for retaliation claims, Hedgepeth does not establish that these actions were "materially adverse—

---

[27] To the extent Hedgepeth argues Prokop's discussion of her process for raising payment errors constitutes a reprimand, (Am. Compl. ¶ 10; *see also* Prokop Hedgepeth October 27–28, 2016, Email Chain), "reprimands, without collateral consequences, are not 'materially adverse,'" *Hinton*, 185 F. Supp. 3d at 832. Hedgepeth cannot support her retaliation claims with Prokop's "reprimand" here.

such that they might have dissuaded a reasonable worker from engaging in protected activity" for three reasons. *Strothers*, 895 F.3d at 328.

First, even accepting Hedgepeth's premise that Capital One retaliated against her by giving her "[c]onflicting and confusing work assignments" in May 2018, (Mem. Resp. Mot. Summ. J. 24), a reasonable employee would not have found such an action "materially adverse," *Strothers*, 895 F.3d at 328. In an unpublished opinion, the Fourth Circuit has determined that assigning an employee "difficult work [among other actions]. . . . simply would not have dissuaded a reasonable employee from making a discrimination charge." *Brockman,* 217 F. App'x at 206–07. Other courts in the Eastern District of Virginia have also concluded that assigning an employee an increased workload does not amount to a materially adverse action that would dissuade a reasonable employee from bringing a charge of discrimination. *Michael,* 2019 WL 128236, at *4; *Hughes v. Navy Fed. Credit Union*, No. 1:10cv1430, 2012 WL 32404, at *13 (E.D. Va. Jan. 4, 2012). Similarly, an employer assigning an employee conflicting or confusing work assignments does not amount to a materially adverse action as a matter of law.

Second, Capital One assigning Hedgepeth a "Meeting Expectations" grade in her June 2018 Scorecard does not constitute a "materially adverse action." *Strothers*, 895 F.3d at 328. Even if the June 2018 Scorecard could be categorized as a poor performance review, in the Fourth Circuit poor performance reviews are not considered to be "materially adverse" actions. *Hinton*, 185 F. Supp. 3d at 832 (citing *Parsons v. Wynne*, 221 F. App'x 197, 198 (4th Cir. 2007)); *see also Hamilton v. Prince George's Cnty.*, No. 17cv2300, 2019 WL 4735429, at *5 (D. Md. Sept. 27, 2019) ("[a] poor performance review or reprimand does not constitute an adverse action unless it causes 'real harm to [the plaintiff's] employment or is an intermediate step to discharge'" (citations omitted)).

Third, placing an employee on a performance improvement plan, without more, does not constitute a materially adverse employment action. As stated above, Hedgepeth has submitted no evidence that Capital One placed her on a performance improvement plan, and the Court cannot consider her claims to that effect. Even if she had submitted such evidence, a performance improvement plan alone would be insufficient to create a dispute of material fact as to whether Capital One had taken a materially adverse action against her. "A . . . performance improvement plan alone will not constitute materially adverse action." *Michael,* 2019 WL 128236, at \*4 (citing *Emami*, 241 F. Supp. 3d at 685); *see also Jensen-Graf*, 616 F. App'x at 598 ("A poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment" (quoting *James*, 368 F.3d at 377)). While "[a] poor review or performance plan . . . can support an adverse action claim if the employer relies upon it to later take additional action, such as discharging or demoting the employee," *Michael*, 2019 WL 128236, at \*4, Hedgepeth does not make any allegations that she has been demoted or discharged, or that Capital One has taken any further actions against her such as reducing her benefits or pay. Indeed, she remains in the same position, with the same title. (Hedgepeth Emp. Profile; Am. Compl. ¶¶ 9, 47.)

Because Hedgepeth has not proffered evidence that would allow a reasonable juror to conclude that Capital One took a materially adverse action against her, Hedgepeth's retaliation claims brought pursuant to Title VII, § 1981, and the ADEA cannot survive summary judgment. The Court will grant Capital One's Motion for Summary Judgment as to Counts IV, V and VIII.

## VII.   Conclusion

For the foregoing reasons, the Court will grant Capital One's Motion for Summary

Judgment in its entirety.  (ECF No. 36.)

An appropriate Order shall issue.

_____
/s/
M. Hannah Lauck
United States District Judge

Date: 9/30/20
Richmond, Virginia